NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0091n.06
Filed: February 6, 2006

No. 04-6145

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| STACY MATHIS, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF TENNESSEE |
| MAHLE, INC., | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: CLAY and COOK, Circuit Judges; COOK, District Judge.[*]

COOK, Circuit Judge. Stacy Mathis, an employee of Defendant Mahle, Inc., submitted insurance claims under Mahle's ERISA plan, seeking reimbursement for medical expenses related to a gunshot wound to the face. Mahle's third-party administrator denied Mathis's claims, calling the injury "self-inflicted." Mathis sued Mahle, the party ultimately responsible for claims decisions, for payment of his claims, disputing the "self-inflicted" label. The district court, conducting de novo review, concluded that Mahle improperly denied Mathis's claims. Because the district court should have reviewed Mahle's decision under the "arbitrary and capricious" standard and Mahle's decision survives such scrutiny, we reverse the judgment of the district court.

I

---

[*]The Honorable Julian Abele Cook, Jr., United States District Judge for the Eastern District of Michigan, sitting by designation.

No. 04-6145
*Mathis v. Mahle, Inc.*

Mathis's father admitted him to Lakeway Regional Hospital for treatment of a gunshot wound to the face, and a nurse wrote in the "Initial Assessment Form" that "Father states that he shot him self [sic] in his truck due to marital problems." According to hospital reports, the bullet entered Mathis's face "under the chin" and exited "through his nasal region." Lakeway transferred Mathis to University of Tennessee ("UT") Memorial Hospital. Two days later, once he regained his speech abilities, hospital personnel requested that he consult a psychiatrist in the hospital. The psychiatrist noted on the consultation form, "Patient states the event was accidental. If evidence to contrary—plz consult [illegible]."

Mathis participated in Mahle's self-funded health and dental insurance plan (the "Plan"). The Plan authorized Acordia, a third-party administrator, to make initial claims decisions. An insured could appeal Acordia's initial decision to Mahle by submitting "a written request for review . . . to [Mahle's] Human Resources Office." Mathis submitted claims for his medical and dental expenses, and Acordia denied payment of Mahle's claims. Acordia sent Mathis an "Explanation of Benefits," noting that the Plan excepted from coverage claims for "self-inflicted injury" and describing the proper appeal procedure. Mathis contacted Carolyn Miner, Mahle's employee benefit coordinator, about the denial of his claims. Miner requested reconsideration by Acordia, faxing a note from one of Mathis's treating physicians, but Acordia continued to deny Mathis's claims. Mathis failed to submit a written request for review to Mahle's human resources office.

Mathis sued Mahle for payment on his claims. Mahle initially named Acordia as an indispensible party, but the district court found Acordia to be "a third party administrator and . . . not a proper party to th[e] lawsuit." The court explained that, "[u]nder the terms of the Plan, Mahle is the Plan Administrator of its fully self-funded Plan, and . . . Mahle retained the sole authority to make final decisions regarding benefits."

After Mahle and Mathis cross-moved for summary judgment, the district court found the administrative record to be inadequate and remanded the case "to the claims administrator to afford the plaintiff a full and fair review, with complete medical records, by the appropriate named fiduciary of the decision denying the claim." Mahle then sent Mathis "an official, written denial of the appeal of [his] claim for benefits." The matter returned to the district court, which conducted de novo review and granted Mathis summary judgment. Mahle appeals, arguing that the court should have used a deferential "arbitrary and capricious" review standard.

II

This court reviews de novo the district court's decision to grant summary judgment on an ERISA claim. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). We also review de novo the district court's selection of a standard under which to review the plan administrator's decision. *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 807 (6th Cir. 2002).

At the outset, we note the presence in this case of a readily-apparent conflict of interest. Mahle self-funds its insurance plan and thus holds a direct financial interest in the denial of claims. It also maintains discretion over the ultimate disposition of claims, creating the conflict of interest. *See Killian v. Healthsource Provident Adm'rs, Inc*., 152 F.3d 514, 521 (6th Cir. 1998). We factor this conflict into our review, although it does not change the review standard. *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 506 (6th Cir. 2005).

A. Appropriate Review Standard

The district court announced, without any discussion of the appropriate review standard, that it reviewed Mahle's decision de novo. The Plan vests Mahle with discretion to determine eligibility for benefits and construe the terms of the plan. Generally, where a plan confers discretion on an administrator, the court "review[s] the denial of benefits only to determine if it was arbitrary and capricious, and will uphold [the] decision if it is rational in light of the plan's provisions." *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 456-57 (6th Cir. 2003) (quotations and citations omitted).

Even where a plan vests a party with discretion, however, this court conducts de novo review of claims determinations where a party other than the one authorized by the plan in fact renders the decision. *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595-96 (6th Cir. 2001). Mathis contends that Acordia, rather than Mahle, reviewed his claims, so that the district court properly conducted de novo review. Mahle counters that it reviewed Mathis's claims once it had proper notice of the

appeal—specifically, after the court remanded the case for "a full and fair review . . . by the appropriate named fiduciary." Mathis responds that this compulsory review does not justify review under the arbitrary and capricious standard.

Mathis reasons that, although he failed to precisely follow the Plan's appeals procedure, he provided a de facto notice of appeal when he contacted Mahle's employee benefits coordinator, Miner. He asserts that Mahle, through Miner, delegated its review authority to Acordia when Miner requested Acordia to review its decision. But a claimant "cannot seek to estop the application of an unambiguous written provision in an ERISA plan." *Marks*, 342 F.3d at 456 (holding, where employer allegedly misrepresented facts so that employee would miss a claims deadline, that employee was nonetheless bound by the deadline). The Plan unambiguously stated that "the Participant . . . may make a written request for review of the denial [by] submitting such request to Human Resources Office of the Employer," and Mathis cannot avoid this provision.

The district court, consistent with its holding that Acordia "perform[ed] purely ministerial functions such as processing claims," remanded Mathis's claims to Mahle "to afford the plaintiff a full and fair review, with complete medical records, by the appropriate named fiduciary." After Mahle denied Mathis's claims, the district court reviewed Mahle's decision. Because the Plan identified Mahle as having "absolute discretion . . . to decid[e] all disputes of eligibility," the district court should have reviewed under the arbitrary and capricious standard. *Cf. Stoll v. W. & S. Life Ins. Co.*, 64 Fed. Appx. 986, 991 (6th Cir. 2003) (refusing to entertain plaintiff's claim, unraised below,

of an improper decisionmaker because, although the initial decisionmaker was improper, the proper decisionmaker "ultimately did review and reject" her claim after receiving a letter from the plaintiff's attorney).

## B.  Review of Mahle's Decision

Having concluded that the district court employed an inappropriate standard of review in this case, we now examine Mahle's determination under the more deferential arbitrary and capricious review standard.  "'When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005) (quoting *Davis v. Ky. Fin. Co. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)).  Mahle, in denying Mathis's claims, asserted that his injuries were intentional, and thus were "self-inflicted" within the meaning of the Plan.  Mahle's explanation for why its decision was not arbitrary and capricious relies on the statements of hospital personnel and of Mathis's family.  Mathis discounts those statements, calling the hospital-personnel statements ambiguous and the family's statements inconsistent.  Mathis then points to the consulting psychiatrist's report citing Mathis's explanation that the gun accidentally discharged as he unloaded it.

## 1.  Hospital Reports

A number of hospital reports describe Mathis's injury as "self-inflicted." The district court found the hospital records' use of this term to be ambiguous: "UT's operative report describes the injury as a 'self-inflicted gunshot wound to the face' but this report does not indicate whether the gunshot wound was accidental or intentional. The 'self-inflicted' notation may simply have meant that Mr. Mathis was not the victim of criminal assault." An inspection of the record, however, casts doubt on this conclusion. The operative report to which the district court referred was dictated by the resident physician, Dr. Peter Chang. Mathis's "Discharge Summary," also dictated by Dr. Chang, eliminates the ambiguity. There, Dr. Chang stated that Dr. Catron, the consulting psychiatrist, "noted that the patient *denies any self-infliction* and that this was an *accident* and that this was not a suicide attempt." (Emphasis added.) Dr. Chang's use of the term "self-infliction" contrasts with his use of the term "accident." Other reports dictated by Dr. Chang also describe Mathis's injuries as stemming from a "self-inflicted gunshot wound."[1]

## 2. Family Accounts

Mathis's family described his injury as intentional. A Lakeway Emergency Department Nursing Assessment Record stated, "Mother came into ER. States son has shot himself." A nurse wrote in Lakeway's "Initial Assessment Form" that "Father states that he shot him self [sic] in his truck due to marital problems." A police officer took statements of Lakeway emergency room personnel and of Mathis's family. Lakeway's ER personnel recited to the officer their understanding

---

[1]These reports were, of course, issued prior to the Discharge Summary, which describes Dr. Catron's consultation report.

of Mathis's father's account of events: Mathis was depressed over a recent divorce, went riding in his truck, shot himself, wrecked the truck, returned to his father's house, and his father drove him to Lakeway. The father, mother, and brother's account, as recorded by the officer, differs somewhat: Mathis, who had been drinking at his grandfather's house, was depressed because of his recent divorce. He attempted to leave in his vehicle, but ran into a ditch on his grandfather's property. He returned to his grandfather's house, became enraged, shot himself, and his father drove him to Lakeway.

Mathis calls the two descriptions of the events "facially inconsistent" as to the location of the shooting and the timing of events. The hospital staff understood Mathis's father to say that Mathis shot himself in his truck and then wrecked the truck. Under the family's account, the wreck occurred first, and Mathis shot himself at his grandfather's house. These differences are unsurprising, given the emergency situation at the time Mathis's father described the events to the hospital staff. By the time the officer interviewed Mathis's family at the UT hospital, the situation was more stable, and the events could be recounted in a more orderly, straightforward manner. The apparent conflicts in the two stories do not justify a conclusion that Mahle acted unreasonably in relying on them for its self-inflicted label.

### 3. Location of the Wounds

Finally, Mahle points to the location of Mathis's wounds as supporting its decision. The bullet entered underneath Mathis's chin and exited through the nasal area. The location of the

wounds comports with the family's description of events—that Mathis "produced a 9mm pistol . . . placed it under his chin and fired one round."[2] Mahle did not act unreasonably in discounting Mathis's accidental-discharge explanation, which would require that Mathis unloaded the weapon with the gun's nozzle pointed upward, directly below his chin as Mathis looked straight ahead on a horizontal plane rather than looking down at the gun as he unloaded it.

### 4. Mathis's Evidence

Mathis counters that other evidence supports his position. He argues, for instance, that Dr. Catron accepted Mathis's explanation without further inquiry. Mathis also directs the court to a letter that his treating physician, Dr. Shanks, sent to Acordia. Dr. Shanks wrote that "Dr. Catron . . . achieved an accurate history describing the injuries as the result of an accidental discharge of the gun. He did not see anything to contradict the history given by the patient so he dismissed himself from the care and did not recommend any treatment." Dr. Catron's consultation report, however, merely indicates his reliance on Mathis's explanation, without purporting to reach any medical conclusions. The report reads in its entirety: "Patient states the event was accidental. If evidence to contrary—plz consult [illegible] crisis. Thnx - /s/ Dr. Catron." Nothing in Dr. Catron's consultation report or in Dr. Shanks's letter indicates that either of them spoke with Mathis's family about the injury, nor does Dr. Catron's report purport to have "achieved an accurate history."

---

[2]It remains unclear whether the family witnessed Mathis's actions. Their description of the events, as recorded by the officer, reads as a first-hand account. But Mathis's treating physician at UT hospital wrote in his letter to Acordia that "there were no witnesses."

Assuming the plausibility of Mathis's explanation of his injuries, we must nonetheless defer to Mahle so long as "'it is possible to offer a reasoned explanation, based on the evidence'" for Mahle's decision. *Gismondi*, 408 F.3d at 298 (quoting *Davis*, 887 F.2d at 693). Here, the evidence in the record provides a reasoned explanation for Mahle's conclusion that Mathis's injuries were "self-inflicted" as the term is used in the Plan, and Mahle's denial of benefits, therefore, cannot be said to be arbitrary and capricious.

## III

Because the district court should have reviewed Mahle's decision under the arbitrary and capricious review standard, and because Mathis fails to convince the panel that Mahle's decision was arbitrary and capricious, we reverse the judgment of the district court and remand the case for entry of judgment in favor of Mahle.

No. 04-6145
*Mathis v. Mahle, Inc.*

**CLAY, Circuit Judge**, dissenting. This case presents a startling example of arbitrary and capricious behavior on the part of a plan administrator. In its decision to deny the medical claims of Plaintiff Stacy Mathis, Defendant Mahle, Inc. unabashedly placed primary reliance on the speculative statements of Plaintiff's family members and the repetition of those statements in subsequent medical reports. Defendant's use of such unreliable evidence to justify its benefits decision demonstrates irrationality that should not prevail in this Court. Therefore, I respectfully dissent.

As an initial matter, while I agree that this Court reviews Defendant's administrative decision under the arbitrary and capricious standard, I stress that we still have a responsibility to engage in meaningful review of Defendant's decision to insure the protection of members of the benefits plan. "[M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. UNUM Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). "Deferential review is not no review, and deference need not be abject." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). While this Court should rightfully defer to rational and reasonable decisions, when a plan administrator bases its decision on unreliable evidence, we must reject that decision. *Glascoe v. Central States, SE SW Areas Pension Fund*, No. 00-6430, 35 Fed. App'x 121, 124-25 (6th Cir. Mar. 29, 2002) (unpublished opinion). *See also Darrell Andrews*

Case No. 04-6145
*Mathis v. Mahle, Inc.*

*Trucking, Inc. v. Fed. Motor Carrier Safety Admin.*, 296 F.3d 1120, 1134-35 (D.C. Cir. 2002) (finding that agency use of unreliable evidence would constitute arbitrary and capricious behavior).

Moreover, in deciding whether Defendant's benefits decision was arbitrary or capricious, we must consider the conflict of interest apparent when a plan administrator is also the payer of the benefits under the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("[T]hat conflict *must* be weighed as a facto[r] in determining whether there is an abuse of discretion." (emphasis supplied) (internal quotations and citation omitted).) The majority's opinion purports to recognize its duty to consider this conflict, but it does not actually analyze the nature or extent of the conflict in this case. Specifically, the majority in this case stated, "We factor this conflict into our review," yet it never so much as mentions this conflict again in its opinion. Plaintiff in this case submitted over $40,000 in medical bills in claims that were denied by Defendant. Defendant's conflict, as one factor among several to be considered, must be viewed in light of the cost Defendant was able to eliminate by rendering an adverse decision against Plaintiff.

Turning now to the record, the evidence shows that Plaintiff was admitted to Lakeway Regional Hospital with a single gunshot wound. Due to the nature of the wound, he was unable to speak. When he was sufficiently healed, Plaintiff communicated to medical personnel that the gunshot was the result of an accidental discharge while he was attempting to unload his handgun. Plaintiff also stated that there were no witnesses to the accident. Plaintiff repeated this same version of events in his application for short-term disability benefits.

Case No. 04-6145
*Mathis v. Mahle, Inc.*

It is evident that Defendant improperly relied on Plaintiff's family members' speculative statements as to how Plaintiff sustained the gunshot injury. While the majority opines that it is "unclear" whether Plaintiff's family members witnessed the events surrounding the injury, I believe that it is fairly obvious that they did not see how Plaintiff's injury occurred, nor did Plaintiff relay any relevant information directly to his family after sustaining the injury. First, Plaintiff specifically stated that there were no witnesses to the occurrence, and there is absolutely nothing in the record to contradict this point. Second, not even Defendant asserts that Plaintiff's family members witnessed the gunshot. Third, the nature of Plaintiff's injury prevented him from speaking after the injury, so Plaintiff's family members could not have learned what had happened from Plaintiff. Fourth, Plaintiff's family members recounted inherently conflicting versions of what had occurred. One version, given by the father to Lakeway medical personnel, stated that Plaintiff shot himself while driving, crashed his car, and then went to his father's house, from which his father took him to the hospital. The other version, given by the father, mother and brother to a police officer at the University of Tennessee Hospital, stated that Plaintiff was drinking at his grandfather's house, then crashed his car in a ditch, went back to his grandfather's house, and then shot himself in the house. The fact that there is an inconsistent sequence of events and an inconsistent location of the actual shooting confirms that, in fact, no one witnessed or otherwise had knowledge of the events surrounding the gunshot. The majority attempts to explain away these inconsistencies by pointing to the excitement surrounding this emergency situation. Certainly, in such a situation, small inconsistencies in details should be forgiven; however, when the inconsistencies relate to where the

- 13 -

injury occurred and how the injury took place, the very heart of the matter being disputed, I believe it would be somewhat disingenuous to attribute these inconsistencies to the heat of the moment.

Even assuming *arguendo* the truth of the majority's statement that whether the family members witnessed the occurrence is unclear, Defendant's reliance on the family members' statements would still be improper. If it is unclear whether the family members witnessed the discharge of the gun, then their statements as to the occurrence would be unreliable. In other words, the fact that there is a *possibility* that the family members actually had a basis for their statements does not render their statements somehow reliable. Furthermore, it strains credibility to believe that the family members actually witnessed events which transpired as Defendant alleges, and yet Defendant never sought to present such information to buttress its position.

Likewise, Defendant improperly relied on the Lakeway medical reports, which stated that Plaintiff's injury was self-inflicted.[3] When Plaintiff was admitted to Lakeway Regional Hospital, Plaintiff's father immediately told hospital personnel that Plaintiff's injury was self-inflicted, as evidenced by the Initial Assessment Form. Considering that this form became a part of Plaintiff's medical file at Lakeway, it is no surprise that subsequent Lakeway medical records listed Plaintiff's injury as self-inflicted. The ultimate source of the self-inflicted information was Plaintiff's father,

---

[3]As the majority notes, the phrase "self-inflicted" is subject to a variety of interpretations. I agree with the majority that the district court's definition, "that [Plaintiff] was not the victim of criminal assault," is unreasonable and defies common usage. I also agree that the context of the medical records shows that the phrase "self-inflicted" was meant in contradistinction to "accidental." Plaintiff is correct in his assessment "that the question at issue is whether [Plaintiff] intentionally shot himself." (Pl. Br. 15.)

and Plaintiff's father had no firsthand knowledge whatsoever regarding how Plaintiff's injury took place. Just as Plaintiff's father's statements about the discharge of the gun were unreliable, so too were Lakeway's subsequent memorializations of the father's statements unreliable. In the same vein, University of Tennessee Hospital medical records were unreliable to support the contention that Plaintiff's injury was self-inflicted; that hospital had received the tainted file from Lakeway, and Plaintiff's family members were also present at that hospital. While it is theoretically possible that the doctors and nurses at the two hospitals made an independent assessment of the nature of Plaintiff's injury, the record below does not substantiate that they did so, and it is far more likely that they merely continued to repeat the conjecture and speculation of Plaintiff's family members.

With the bulk of its case in doubt, Defendant has but one scrap of evidence that purportedly indicates that Plaintiff's injury was self-inflicted. Defendant argues, and the majority accepts, that the nature of Plaintiff's injury was more consistent with a suicide attempt than with the unloading of a handgun. This type of conjecture is best suited for a firearms expert (though none was provided), not a medical plan administrator or a reviewing court.

In sum, Defendant's decision was based almost entirely on unreliable or invented evidence. Viewed in conjunction with Defendant's conflict of interest, the record amply demonstrates that Defendant's decision to deny Plaintiff benefits was arbitrary and capricious. I would therefore affirm the district court order requiring Defendant to pay Plaintiff's medical claims.