**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0507n.06
Filed: July 20, 2006

**No. 05-3717**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| STEVEN WICAL, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| THE INTERNATIONAL PAPER LONG-TERM | ) | |
| DISABILITY PLAN, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

_____

BEFORE: BOGGS, Chief Judge, GIBBONS, and GRIFFIN, Circuit Judges.

PER CURIAM.

The district court granted summary judgment to defendant The International Paper Long-Term Disability Plan ("the Plan") in this Employee Retirement Security Act ("ERISA") action, upholding the Plan's discontinuation of plaintiff Steven Wical's long-term disability ("LTD") benefits. Wical appeals, contending that the Plan's decision was arbitrary and capricious. We disagree and affirm.

From 1980 to 1997, plaintiff Wical worked for International Paper Company ("IP"), primarily as a machine operator. Wical was covered by the Plan, which hired Wausau Benefits, Inc. ("Wausau") to process claims. In October 1997, at age 42, Wical applied for long-term disability benefits under the Plan, claiming that work-related injuries causing degenerative disc disease, nerve damage, spinal arthritis, and chronic pain prevented him from doing his job. The Plan granted up

to two years of "own-occupation" benefits beginning December 1997. Wical also successfully applied for Social Security disability benefits ("SS-DIB") retroactive to December 1997.

In May 1999, Wausau sent a letter reminding Wical that his two-year own-occupation period would expire on November 30, 1999. Wical claimed that he was "totally disabled" as defined by the Plan, i.e., unable to perform *any* occupation for which he was qualified by training, education, or experience. Wausau consulted treating, examining, and consulting physicians, its own vocational expert, and a vocational expert hired by Wical. In March 2002, Wausau notified Wical that it was discontinuing his benefits on April 30, 2002. Wical sought internal review from Wausau, and, in July 2002, Wausau upheld the decision. Wical sought further internal review in January 2003 but submitted no additional evidence, and in February 2003, Wausau reaffirmed the decision.

Wical promptly filed the instant complaint and a summary judgment motion; the Plan also moved for summary judgment. In May 2004, the district court rejected Wical's arguments that Wausau (1) should be subject to de novo review, (2) acted arbitrarily by failing to give more weight to his treating physician's opinion, (3) acted arbitrarily by failing to consider his depression and use of anti-depressant and pain medications, (4) erred by relying on an independent medical exam ("IME") and a vocational expert's employability assessment, and (5) was bound or estopped by the Social Security Administration's ("SSA") 2000 determination that he was disabled. However, the district court remanded for further review because Wausau apparently had not considered the SSA award. In September 2004, Wausau determined that the SSA materials did not change the outcome. Wical again sought review in the district court, which granted Wausau judgment on the administrative record, and Wical timely appealed.

I.

The district court had jurisdiction under 29 U.S.C. § 1132(e)(1), and we have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is reviewed de novo unless the Plan expressly gives the administrator the discretionary authority to determine eligibility for benefits or to construe the terms of the Plan,[1] in which case "the highly deferential arbitrary and capricious standard of review is appropriate." *Kalish v. Liberty Mut. / Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 505-06 (6th Cir. 2005) (citations and quotation marks omitted).

A plan's denial of benefits will not be considered arbitrary and capricious "so long as it is possible to offer a reasoned explanation, based on the evidence, for" the denial. *Id.* at 506 (citation omitted). We uphold a benefits determination if it is "rational in light of the plan's provisions." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citation and quotation marks omitted). Nonetheless, we will not "rubber-stamp" the Plan's decision; "[u]nder the arbitrary-and-capricious standard, both the district court and this court must exercise review powers." *Id.*

---

[1]The Plan states that the administrator "has the authority, responsibility and discretion to determine all questions of eligibility and status and has the right to interpret the provisions of the Plan." We have found similar language sufficient to confer the requisite discretion. *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (en banc); *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991).

We will also be mindful of the conflict of interest that is arguably inherent in the fact that IP paid Wausau to process claims,[2] such that Wausau might try to curry favor with its client by recommending the denial of benefits. While such a conflict "does not alter the standard of review . . . [it] should be taken into account as a factor in determining whether the . . . decision was arbitrary and capricious." *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998) (citation omitted).

Lastly, our review of an ERISA plan administrator's benefits decision is limited to the evidence considered by the plan administrator. *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 441 (6th Cir. 2005) (citations omitted).

## III.

Wical's two-year own-occupation Plan benefits period ended on November 30, 1999. Until that date, Wical needed to show only that his condition prevented him from performing his own occupation ("own-occupation disabled"). After that date, the Plan provided, Wical was entitled to continue receiving Plan LTD benefits if he showed that his condition prevented him from performing any and all occupations for which he was suited by experience and education ("any-occupation disabled").

In 1998, the SSA determined that Wical was totally disabled as of December 1997. Based on Wical's SSA award, IP reduced Wical's plan benefits and advised him that he was obligated to reimburse the Plan nearly $8,500, which Wical did.

---

[2]At oral argument on March 30, 2006, the Plan's counsel stated that while he was not sure how IP compensated Wausau, he believed that Wausau was paid a fixed amount per employee.

On January 5, 2000, Wical's treating physician, Dr. Kolodzik, gave Wausau an Estimated Functional Capacity ("EFC") Form stating that Wical was unable to return to his former job, but could return to other work with certain restrictions. According to Wausau's Medical Management Case Notes, Kolodzik's EFC read as follows:

1)  occ: lift 24-34# / Carry 25-34 @ /Push, Pull-seated % Standing/ Squat/ climb/ reach above shlder level.
2)  Freq: Lift & Carry 11-24#.
3)  Cont: Lift & Carry 0-10 #.
4)  Never: lift & carry 35-100#/ bend or crawl.
5)  8hr work day can: sit or stand 1hr w/ rest; walk & alternate sit & stand 2 hts w/ rest;
6)  use hands for repetitive movements: simple & firm grasp, fine manipulating.
7)  Can not use feet for repetitive movements as in operating foot controls.
8)  Restriction of activities: mild – exposure to temp&humidity changes; moderate for driving automotive equipment.
9)  Can not perform own job but can perform other work according to restrictions defined above.

Wausau later asked Kolodzik whether he still agreed with his December 1999 EFC. Kolodzik responded in September 2000 that he did not think Wical would return to work, but he also stated that the restrictions remained the same, i.e. light work with a sit/stand option.

On August 24, 2000, Wical submitted a Claimant Questionnaire stating that he was incapable of working due to chronic lower-back pain, disc degeneration, stomach problems, pain in his legs, knees, and scrotum, and a nerve problem. In response to a question about "current restrictions/limitations," Wical wrote, "1 hr Drive time + Rest if necessary. Up to 30 minute walktime. 15-20 minutes able to sit then have to get up. + standing 15-20 minutes[.] No lifting over 20 lbs. Can't do any bending at the waist that puts pressure on lower back[.]"

In March 2001, Kolodzik submitted an updated EFC that diagnosed "HNP"[3] in the lumbar spine with radiculitis, and spondylosis[4] at vertebrae L3-L4. Kolodzik opined that Wical was "disabled from his own and any occupation due to severe degenerative disk disease at L4-5 and L5-S1. Over a period of years he has deteriorated with his back pain. He has chronic, severe pain on a daily basis." Wausau later noted in its files, "Due to EE [employee]'s age of 45, is in [the] any occupation [period], have sent medical records to be reviewed by IR to determine if EE TD [totally disabled] any occ. EE has not had any x-rays or follow up CT, MRI recently."

On June 4, 2001, Wausau commissioned orthopedic surgeon Michael W. Weiss, M.D., who reviewed Wical's records, including physician office notes, MRI and EMG reports, and claimant and physician statements, and spoke with Wical's treating physician on June 7, 2001. Weiss completed his review on June 12, 2001, and concluded that Wical was "neurologically intact and would be able to work at least sedentary duty with the ability to change position as needed."

Wausau also retained Timothy Fallon, M.D. to conduct an IME. After doing so, Fallon concluded that Wical was not totally disabled. Specifically, Dr. Fallon concluded that

> [Wical] has some discogenic abnormalities in the low back with disk protrusions. He does not present at this time with evidence of a radicular component. Given his low back condition at this time, one would arbitrarily place some restrictions on his physical activities and this would place him in the medium work capacity.

---

[3]HNP probably stands for Herniated Nucleus Polposus. The nucleus polposus is "the soft fibrocartilage central portion of the intervertebral disc" and is also known as the "nucleus gelatinosus" or "vertebral pulp." STEDMAN'S MEDICAL DICTIONARY 1343 (28th ed. 2006) ("STEDMAN'S").

[4]Radiculitis is a synonym for radiculopathy, a disorder of the spinal nerve roots. STEDMAN'S 1622. Spondylosis is an ankylosis (stiffening or fixation) of the vertebra, often used to refer to any degenerative spinal lesion. *Id.* at 813 & 95.

I do not feel he is totally disabled from any occupation.

No further interventional treatment is indicated. . . . .

He would be a candidate for rehabilitation services or vocational rehabilitation, primarily in a situation where his job skills could be assessed and he could be helped with a job search program taking into account his physical restrictions.

Wausau then commissioned vocational consultant William Hyde, who interviewed Wical in January 2002 to determine whether Wical had any transferable skills in light of the restrictions recommended by IME Fallon. Wical told Hyde that he had graduated from high school, taken a couple of college math courses, and had served as a "lead" once or twice a year, which entailed supervising forty to fifty employees. Hyde's report stated:

> [The IME] . . . indicates that Mr. Wical is capable of work activities involving Medium physical demands. Mr. Wical did not feel that he could lift quite 50 pounds, but indicated he could lift as much as 30 pounds on an occasional basis. He also stated that he is capable of sitting, walking, or standing up to approximately 20 minutes at a time before having to change position. . . . . Every six months Mr. Wical makes routine check-up visits to his POR, Dr. Kolodzik, who treats him conservatively with pain medications, anti-inflammatories, and muscle relaxers.
>
> . . . .
>
> **ANALYSIS**
> . . . . *Based upon his worker trait profile and the capacities specified by the [IME] report (Medium physical demands), Mr. Wical could immediately perform* not only *machine operation, assembly, and many other semi-skilled or unskilled production-type jobs*, but he could also perform his prior jobs of Bag Machine Operator and Fork Lift Operator. *Also,* since there is no basis to find that he does not possess at least average (3) general learning ability, verbal aptitude, numerical aptitude, form perception, clerical perception, finger dexterity, and color discrimination, *Mr. Wical could very likely perform some clerical or retail-oriented jobs such as Service Clerk, Counter Clerk, Stock Clerk, Industrial Order Clerk, Sales Attendant*, etc., with some OJT [on-the-job training?]/short-term training and/or some "brush-up" remediation, given the length of time since formal schooling.
>
> . . . .
>
> A search of production-type job openings . . . indicated that there were 89 such jobs currently available within 25-50 miles of Mr. Wical's home. . . . .

. . . .
*[B]ased upon Mr. Wical's education and work history, and the medical/physical capacities information provided by the [IME] report only, he is employable in the local economy.*

(Emphasis added.)

After reviewing Wical's records and the reports of IME Fallon and vocational expert ("VE") Hyde, Wausau concluded in March 2002 that Wical was not "any-occupation" disabled. Wausau's notes state:

> 3-04-02 Thus, we have documented the EE no longer meets the plan definition of TF [TD?]. He has a physical capacity of medium work and has the transferable skills to support such employment. Calculated savings per the life mean reserves table for age 47. 1259.44/100 * 8264 = $104,080.12. Case closed EE no longer TD.

Wical hired an attorney and internally appealed. He submitted an affidavit and records from his treating physician and an employability assessment commissioned by his counsel. Treating physician Kolodzik's May 21, 2002, affidavit stated, in part,

> 5.    Mr. Wical suffers from severe degenerative disk disease in the lumbar spine and from chondromalacia [softening of the cartilage, STEDMAN'S at 369]. As a result of these conditions, Mr. Wical cannot perform any manual labor. Furthermore, because he can neither sit, stand, nor walk for any appreciable length of time without suffering significant pain, he is unfit for any sedentary position.
>
> 6.    . . . Mr. Wical's medical condition renders him unemployable in any capacity.
>
> 7.    Furthermore, Mr. Wical is not a candidate for surgery or any other therapy that might improve his medical condition.

VE Caroline Wolfe prepared an employability assessment based on her April 2002 interview of Wical and her review of Kolodzik's 1992-2002 records, the SSA award, and neurologist Fahey's 1997 EMG report. Wolfe's assessment stated, in pertinent part:

> [A] transferable skills analysis was completed to identify jobs to which Mr. Wical's skills might transfer if he could perform work in even the Sedentary strength range. This analysis revealed a 100% loss of access to jobs that are in any degree related to his work experience and a 99.7% loss of access to unskilled work.
>
> The few jobs that he theoretically could do include some jobs that would require computer skills of which he has none; he has no computer experience. They also include jobs in the seasonal or temporary (tobacco leaf tier) and jobs that are in indus[tries] not found in the Ohio labor market (shoe and watch production). There are no jobs that exist in Ohio in significant numbers that he can realistically perform with his conditions and restrictions.
>
> Mr. Wical has lost access to the labor market. He has full loss of wages. He is not a good candidate for formal retraining.

VE Wolfe's report listed the documents that she had reviewed, and she did not list IME Fallon's 8/2001 report or VE Hyde's 2/2002 employability assessment.

In July 2002, while considering Wical's initial appeal, Wausau commissioned another orthopedic surgeon, Daniel Kharrazi, M.D., to review Wical's file. Kharrazi found that Wical had "lifting limitations to approximately 25 pounds" and needed to avoid repetitive bending, kneeling, and squatting. Kharrazi agreed with Fallon, however, that Wical was not disabled from all suitable occupations. Kharrazi's July 10, 2002, Peer Review Analysis reads as follows:

> . . . . Based on the medical information provided, particularly the . . . IME . . . , the patient is not totally disabled from any occupation. It was felt by Dr. Fallon that the patient is capable of medium work capacity.
>
> . . . . The medical information provided by Dr. Kolozzik [sic] and Dr. Reno have very little objective findings. They are full of subjective complaints of pain but little objective findings.
>
> . . . .
>
> I do not believe the patient is precluded from a sedentary work position with limitations which include breaks to move around every thirty minutes.

The objective findings, which include physical examination, which has, once again, been documented by Dr. Fallon to be almost close to normal for the most part on 08/20/2001, as well as MRI and EMG findings, do not support the assessment completed by Vocare [the employer of Wical's vocational expert, Wolfe].

. . . .

A discography had been performed [o]n 04/22/1993 by Dr. Kolozik [sic]. The patient had an L3-L4, L4-L5, and L5-S1 discography followed by a chemonucleolysis [injection to treat a slipped disk, STEDMAN'S at 357] at L4 and L5-S1. [C]ompletely normal gait. Normal toe and heel walk. Patient is able to squat and rise, lateral bending and rotation does cause him some pain, MRI scan on 07/03/1997 had a broad-based posterocentral disk protrusion at L4-L5 and L5-S1. The patient was also noted to have facet hypotrophic changes and a diffused disk bulge at L3-L4 and L1-L2. EMG on 07/29/1997 was negative.

The patient diagnostically does have low-back pain which is chronic, he does have some evidence of radicular component. Given the clinical and objective findings this does not preclude gainful employment for this patient. The patient should not be considered totally disabled from any occupation as there are occupations which should be able to accommodate him, if you delete the subjective complaints, the objective findings have very little to support the total disability in this patient.

In July 2002, Wausau denied Wical's first-level appeal. The denial stated that Wausau had reviewed the records of Wical's treating physician, IME Fallon's report, the competing employability assessments, and consulting physician Kharrazi's report. In January 2003, Wical filed a second-level appeal that relied on the existing file, and Wausau again denied Wical's request.

IV.

As noted above, a denial of benefits is reviewed de novo unless the Plan gives the administrator the discretion to determine eligibility for benefits or to construe the terms of the Plan, in which case the arbitrary and capricious standard applies. *Kalish*, 419 F.3d at 505-06. Wical asserts that the deferential standard of review does not apply because, notwithstanding the Plan's language conferring such discretion, the Plan administrator did not actually exercise the discretion

conferred. Rather, Wical states, the Plan administrator "simply deferred" to the claims administrator. *Cf. Mathis v. Mahle, Inc.*, 165 F. App'x 457, 459 (6th Cir. 2006) ("Even where a plan vests a party with discretion, however, this court conducts de novo review of claims determinations where a party other than the one authorized by the plan in fact renders the decision.") (citing *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595-96 (6th Cir. 2001)). The district court correctly rejected this argument, noting that "the February 4, 2003, denial of benefits reveals that the Plan administrator did in fact review the administrative record."

Likewise, when the Plan reviewed the SSA ruling and reaffirmed the denial in September 2004, its decision reflected that it had reviewed the administrative record. Wical protests that "[t]he September 28, 2004 decision was limited in scope in that it simply concluded that 'neither the [SSA]'s [award], nor the [SSA] file materials . . . entitle Mr. Wical to benefits under the LTD plan' because 'the information on which the Plan relied was more current and a better indicator of Mr. Wical's medical status at the time the Plan made its claims decision . . . .'"

Therefore, Wical urges, the Plan exercised discretion only on the issue of whether the SSA ruling entitled him to benefits, not the larger ultimate issue of whether he was any-occupation disabled: "[T]he Plan's September 28, 2004 decision, regarding the impact of the [SSA] Award Notice . . . may be subject to an arbitrary and capricious standard . . . . [But t]he heart of Wical's claim – whether Wical is disabled from any occupation – is entitled to de novo review."

Wical emphasizes language from the Plan's September 2004 final denial stating that *Wausau* reviewed the record, *Wausau* explained the reasons for its denial of benefits, and *Wausau* instructed Wical as to what he had to prove. Wical particularly emphasizes the Plan's statement "[s]ince you

did not include any additional medical information with your letter, we find no basis to reverse Wausau Benefits['] determination that Mr. Wical no longer meets the Plan definition of totally disabled." From this statement, Wical concludes that the Plan administrator merely "rubber-stamped" Wausau's decision rather than reviewing the medical evidence in the record and exercising its discretion.

This language, however, does not show that IP failed to use its discretion. As noted, the record shows that the administrator exercised its discretion and judgment in its initial denial. Because Wical failed to present new medical evidence to support his appeal of the initial denial, there was no rational basis for the administrator to depart from its prior judgment. Wical cannot appeal without offering additional evidence, secure a discretionary determination from the administrator that Wausau was right, and then complain that the administrator failed to exercise its discretion a second time based on exactly the same evidence. As a result, Wical's argument lacks merit, and we apply the abuse-of-discretion standard.

## V.

In 1998, the SSA determined that Wical was totally disabled as of December 1997. Based on Wical's SSA award, IP reduced Wical's plan benefits and advised him that he was obligated to reimburse the Plan nearly $8,500, which Wical did. Wical argues that where the Plan "by the terms of the Plan documents, intentionally seek[s] to reap the financial benefit of requiring its participants to seek out social security disability benefits, . . . the Plan should be bound by the SSA determination." The district court rejected this argument, and so do we, for four reasons.

The first reason the SSA's ruling does not bind the Plan is that an SSA regulation governing the weight to be accorded physicians' opinions does not apply here. In the Social Security context, a treating physician's opinion is entitled to complete deference if it is totally uncontradicted. *Cohen v. Sec'y of HHS*, 964 F.2d 524, 528 (6th Cir. 1992) (citation omitted). Even where the treating physician's opinion is contradicted by other competent medical sources, it is still entitled to "great weight" so long as it is "supported by sufficient clinical findings and [is] consistent with the evidence." *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 287 (6th Cir. 1994). But "[n]othing in the Act [ERISA] itself, however, suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830-31 (2003) (citations omitted). In the wake of *Black & Decker*, we stated that "it would be incongruous to hold that, although the 'treating physician rule' is not applicable in ERISA cases, the ERISA plan administrator is bound by the disability determination of the SSA, which is required to apply that rule." *Hurse v. Hartford Life & Acc. Ins. Co.*, 77 F. App'x 310, 317 (6th Cir. 2003). We ratified that reasoning in *Whitaker v. Hartford Life & Acc. Ins. Co.*, 404 F.3d 947 (6th Cir. 2005), stating: "Adopting the reasoning of *Hurse*, we hold that an ERISA plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan." *Id.* at 949. Thus, the Plan was not legally obligated to follow the SSA's ruling to show presumptive deference to Kolodzik, or to accord greater weight to his opinion than those of the examining and reviewing physicians. *See Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 293-94 (6th Cir. 2005).

The second reason the SSA's disability ruling does not bind the Plan is that the SSA's definition of disability is not the same as the Plan's definition of "any-occupation" disability. The SSA defines a person as disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Furthermore, an individual is considered disabled only if his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy, regardless of whether such work exists . . . where he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

By contrast, under the IP plan, Wical would be "considered totally disabled and . . . eligible to continue receiving LTD benefits only if [he is] incapable of performing any occupation or employment for which [he is] qualified by education, training, or experience, and [is] under the regular care of a licensed physician." This material difference between the SSA and IP standards for LTD is another, independent reason why the SSA ruling cannot bind IP. *See Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 333 (7th Cir. 2000); *Hornback v. NY Times Co. LTD Plan*, No. C05-508, – F. Supp. 2d –, 2006 WL 496050, at *9-10 (N.D. Cal. Mar. 1, 2006); *Dahlin v. Metro. Life Ins. Co.*, 255 F. Supp. 2d 987, 1004-05 (N.D. Iowa 2003).

The third reason that the SSA's ruling does not bind the Plan is that it occurred *five years* before Wausau's determination. The Plan considered Wical's condition much later in time, and it

received substantial medical evidence that did not exist at the time of the SSA's ruling, including the opinions of three orthopedic surgeons and a vocational expert: IME Fallon's August 2001 opinion that Wical was still capable of medium-exertion work, reviewing physician Weiss's June 2001 opinion that Wical was "neurologically intact and would be able to work at least sedentary duty with the ability to change position as needed," reviewing physician Kharrazi's July 2002 opinion that Wical was not totally disabled, and VE Hyde's February 2002 assessment that Wical was employable in the local economy. Accordingly, it was not arbitrary and capricious for the Plan (on remand in 2004) to conclude that "the information on which [it] relied was more current and a better indicator of [Wical's] medical status at the time the Plan made its claims decision [in 2003] . . . ."

Lastly, contrary to Wical, under these circumstances the SSA disability ruling does not estop IP from arguing that Wical did not suffer from "any-occupation" disability. Wical's reliance on *Ladd v. ITT Corp.*, 148 F.3d 753 (7th Cir. 1998), is unavailing. There the insurer, MetLife,

> encouraged Ladd to apply for [SS-DIB], and even provided her with legal representation to assist her with the application. After a hearing, an administrative law judge [ALJ] found that Ladd was indeed totally disabled, and awarded her benefits. . . . .

> MetLife's employee welfare plan entitles it to offset benefits under the plan by any social security disability benefits received by the employee. The plan is more generous than social security, so Ladd still had a claim against the plan even after she got her [SS-DIB]. . . . . After she was awarded [SS-DIB], MetLife referred her file to a Dr. Bertrand . . . . [U]sing the criteria employed by the [SSA], he concluded in a perfunctory report that Ladd had sufficient 'residual functional capacities' to work a full eight-hour day at a sedentary job. . . . . On the basis of Bertrand's report (and also a vocational assessment [that] . . . was based on Bertrand's conclusion that Ladd is able to do sedentary work . . . MetLife denied Ladd's claim.

*Ladd*, 148 F.3d at 755. After criticizing the weakness of the evidence supporting MetLife's

conclusion, the Seventh Circuit also intimated that it would be unjust to allow MetLife to argue that

Ladd was not totally disabled when it had supported the opposite argument before the SSA:

> The grant of [SS-DIB] . . . has an additional significance. It brings the case within the penumbra of the doctrine of judicial estoppel – that if a party wins a suit on one ground, it can't turn around and in further litigation with the same opponent repudiate the ground in order to win a further victory. The doctrine is technically not applicable here, because MetLife and ITT . . . were not parties to the proceeding before the [SSA]. Yet they "prevailed" there in a practical sense because the grant of [SS-DIB] to Ladd reduced the amount of her claim against the . . . plan. If we reflect on the purpose of [judicial estoppel], which is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant, we see that its spirit is applicable here. To lighten the cost to the employee welfare plan of Ladd's disability, *the defendants encouraged and supported her effort to demonstrate total disability to the [SSA], going so far as to provide her with legal representation.* To further lighten that cost, it then turned around and denied that Ladd was totally disabled, even though her condition had meanwhile deteriorated. In effect, having won once the defendants repudiated the basis of their first victory in order to win a second victory. This sequence casts doubt on their evaluation of Ladd's claim, even if it does not provide an independent basis for rejecting that evaluation.

*Ladd*, 148 F.3d at 756 (emphasis added, internal citations omitted).

But we have already expressly rejected an attempt to read *Ladd* as broadly as Wical would

read it. We first discussed *Ladd* in *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516 (6th Cir. 2003),

where we held that it was inappropriate for the Plan administrator to ignore the SSA's disability

ruling. This was true, the *Darland* panel reasoned, for two reasons: (1) the administrator had failed

to follow the "treating physician rule," which generally requires deference to the opinions of treating

physicians, and (2) because the administrator asked the employee to apply for SS-DIB, it should be

estopped from arguing later that the SSA's determination was mistaken. *Darland*, 317 F.3d at 530.

In a later published decision, however, we took pains to cabin and distinguish *Darland*:

> [A]lthough Liberty indeed benefitted from the SSA determination by seeking and receiving reimbursement from [employee] for a portion of the payments it previously made to [employee], and it is clear that Liberty *required* [employee] to seek social security benefits for the very purpose of reducing its own obligations, we do not believe that *Darland* intended to apply the principles of judicial estoppel as broadly as [employee] asks us to do here. On facts similar to those here, *Darland* discussed the *concept* of judicial estoppel and expressed concern about the course of action taken by the plan administrator – i.e., availing itself of the benefits of an SSA award and then ignoring or repudiating that award when denying continued plan benefits. *Darland* went on to say, however, that "*though not directly applicable in this case*, the principles of judicial estoppel certainly weigh against [plan administrator] taking such inconsistent positions." In reaching this conclusion, *Darland* relied on the Seventh Circuit's decision in *Ladd . . .* , where, again on similar facts, Judge Richard Posner drew on the "penumbra of judicial estoppel" and concluded that a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, "casts additional doubt on the adequacy of their evaluation of . . . [a] claim, *even if it does not provide an independent basis for rejecting that evaluation*."
>
> It is apparent, accordingly, that *while Darland and Ladd counsel a certain scepticism of a plan administrator's decision-making on facts such as those at issue here, they do not stand for the proposition*, urged by [employee], *that a plan administrator is conclusively estopped from disagreeing with an SSA award whenever the plan benefits from such an award.* Accordingly, the Court concludes that . . . the SSA's disability determination does not, standing alone, require the conclusion that Liberty's denial of benefits was arbitrary and capricious. . . . .

*Calvert*, 409 F.3d at 294-95 (emphasis added in second paragraph, citations omitted).

Moreover, our general precedents on the doctrine of judicial estoppel do not permit a blanket rule that a plan is estopped from arguing that an employee is not disabled merely because the administrator required or encouraged the employee to apply for SS-DIB or because it reduced its obligation due to his receipt of SS-DIB. Wical's situation does not meet that doctrine's criteria.

"Judicial estoppel forbids a party from taking a position inconsistent with one successfully and unequivocally asserted by that same party in an earlier proceeding." *Pennycuff v. Fentress Cty.*

- 17 -

*Bd. of Ed.*, 404 F.3d 447, 452 (6th Cir. 2005) (citation and internal quotation marks omitted).

Judicial estoppel "protects the integrity of the judicial process by 'prohibiting parties from

deliberately changing positions according to the exigencies of the moment.'" *New Hampshire v.

Maine*, 532 U.S. 742, 749-50 (2001) ("*NH*") (citation omitted).

While "there is no set formula for assessing when judicial estoppel should apply," *In re

Cmnwlth. Inst. Secs., Inc.*, 394 F.3d 401, 406 (6th Cir. 2005) (citing *NH*, 532 U.S. at 750), the

Supreme Court has set forth three factors for us to consider. "First, a party's later position must be

'clearly inconsistent' with its earlier position," *Pennycuff*, 404 F.3d at 452-53 (quoting *NH*, 532 U.S.

at 750), and the earlier position must have been taken under oath. *Valentine-Johnson v. Roche*, 386

F.3d 800, 811 (6th Cir. 2004) (citation omitted). Second, we consider "whether a party had

successfully persuaded a court to accept his previous position, 'so that judicial acceptance of an

inconsistent position in a later proceeding would create the perception that the first or the second

court was misled.'" *Pennycuff*, 404 F.3d at 453 (quoting *NH*, 532 U.S. at 750) (citation and some

quotation marks omitted)). Finally, we consider "'whether the party seeking to assert an inconsistent

position would derive an unfair advantage or impose an unfair detriment on the opposing party if

not estopped.'" *Pennycuff*, 404 F.3d at 453 (quoting *NH*, 532 U.S. at 751).

Unlike the employer in *Ladd*, IP did not provide Wical with counsel or otherwise help him

secure SS-DIB. Thus, IP never *took* an earlier position that Wical was not disabled under the SSA's

definition, let alone "successfully persuade[d] a court to accept" such a position. *See Pennycuff*, 404

F.3d at 452-53; *accord Conley v. Pitney Bowes*, 176 F.3d 1044, 1050 (8th Cir. 1999) ("Even if we

were disposed to follow *Ladd*, neither of its conditions is met here: The doctors who examined Mr.

Conley were not unanimous, and the defendants did not help him make his case to the Social

Security Administration."). Consequently, Wical cannot meet the first two judicial-estoppel criteria,

and allowing IP to argue that Wical is not "any-occupation" disabled does not create the perception

that the SSA or this court was misled. *See Pennycuff*, 404 F.3d at 453.

For these reasons, the SSA's ruling did not bind the Plan, nor should the Plan be estopped

from arguing that Wical is not "any-occupation" disabled as defined by the Plan. Wical may present

the SSA's ruling only as one piece of evidence that he met the Plan's definition. As discussed

below, even assuming that the SSA's ruling tends to support Wical's position, it does not undermine

our conclusion that substantial record evidence supports the Plan's contrary determination.

VI.

From the beginning of the process, competent medical evidence accumulated that could

rationally support the conclusion that Wical's back condition and related limitations did not render

him "any-occupation" disabled. After Wical's two-year own-occupation period ended and the "any-

occupation" period began in late 1999, his own treating physician, Kolodzik, stated that while Wical

could not return to his former job, he could adjust to other work within certain restrictions on

exertion.

Although Kolodzik later downgraded his assessment of Wical's ability to work, Wical has

not shown that it was irrational for the Plan to give greater weight and credence to other physicians'

more-consistent opinions to the contrary. For instance, in June 2001, Weiss, an orthopedic surgeon

who reviewed Wical's file and spoke with his treating physician, found that Wical was

"neurologically intact" and opined that he would be able to work "at least sedentary duty with the

ability to change position as needed." Orthopedic surgeon Fallon examined Wical, reviewed his records, and concluded in August 2001 that Wical could handle jobs that are "medium work capacity" as defined by the U.S. Department of Labor.

Considering Fallon's report and the physical restrictions Fallon recommended, vocational expert Hyde interviewed Wical and concluded that he was employable in a suitable occupation in the local (Ohio) economy. Hyde based this opinion in part on Wical's own contemporaneous statements that he could walk, sit, or stand for twenty minutes before needing to change position, could lift as much as thirty pounds occasionally, and was a high school graduate who had taken two college mathematics classes and occasionally supervised forty to fifty employees.

Perhaps most significantly, another orthopedic surgeon reviewed Wical's file and criticized treating physician Kolodzik's "unemployable" assessment for lacking an adequate empirical or "hard" scientific basis beyond Wical's subjective complaints of pain and difficulties with certain types and degrees of movement. Kharrazi noted that Kolodzik's unemployability opinion was supported by very little objective medical evidence, and Wical has never identified such evidence allegedly supporting Kolodzik's opinion.

Kharrazi also criticized Wical's vocational expert Wolfe for reaching a conclusion that was not supported by the medical information provided by treating physician Kolodzik and psychiatrist Reno. Kharrazi found that Wolfe's employability assessment was inconsistent with Wical's MRI and EMG test results, and Wical has not tried to show how the MRI or EMG results support or are consistent with Wolfe's assessment. Moreover, apart from Kharrazi's criticisms, the Plan could rationally accord little or no weight to VE Wolfe's opinion because, according to her own report,

she did not even review IME Fallon's report or vocational expert Hyde's employability assessment.

On balance, Wical has not shown that it was arbitrary and capricious for the Plan to reject Kolodzik's and Wolfe's opinions and instead credit Kharrazi's opinion that, subject to limits on lifting, repetitive bending, kneeling, and squatting, Wical was not totally disabled. Combined with the findings and opinions of IME Fallon and VE Hyde, Kharrazi's unrebutted criticisms could lead to a rational determination that Wical was not totally disabled from all suitable occupations.

VII.

Wical contends that IP's decision to deny him long-term disability benefits is flawed because "there is no reference in [IME] Fallon, [the Plan's VE] Hyde's or [reviewing physician] Kharrazi reports how Wical's depression affects, if at all, his ability to return to work. As [Wical's VE] Wolfe observed, however, Wical's mental health imposes a significant barrier to Wical's ability to work." Wical's argument on this score lacks merit.

As the district court noted, Wical did not list depression on his application. On the contrary, Wical's May 21, 1999, application represented that he had no psychological impairments. Moreover, Wical did not mention depression in his appeal letters, nor did Kolodzik's appellate affidavit mention that Wical suffered from depression. Nor did Wical tell IME Fallon that he suffered from depression. Wical's reply brief does not dispute any of these statements; indeed, his reply brief does not pursue the depression argument at all.

Wical cannot be heard to complain that the Plan failed to consider the effect of his depression and related medications on his ability to work, because he failed to apply for benefits on that basis

or even to supplement the record later on appeal to raise that issue explicitly and squarely. *See generally Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 519 (1st Cir.) ("[T]he focus of judicial review . . . is ordinarily on the record made before the administrator and at least some very good reason is needed to overcome that preference. . . . . [It is] at least doubtful that courts should be in any hurry to consider evidence or claims not presented to the plan administrator . . . .") (internal citations omitted), *cert. denied*, – U.S. –, 126 S. Ct. 425 (2005).

## VIII.

As noted above, there is a potential conflict of interest inherent in the fact that IP paid Wausau to administer claims. While such a conflict "does not alter the standard of review, . . . [it] 'should be taken into account as a factor in determining whether the . . . decision was arbitrary and capricious.'" *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998) (citation omitted).

If the record presented a close call as to whether substantial evidence supports Wausau's determination, evidence that the determination was tainted by conflict of interest might tip the scale. However, this record presents substantial evidence to support the conclusion that Wical's condition was not "any-occupation" disabled. Put another way, a plan administrator that was free of any possible conflict of interest could have rationally denied Wical's claim on this record.

For these reasons, we conclude that the Plan did not act arbitrarily and capriciously in denying Wical's application for LTD benefits after the two-year own-occupation period expired.

Affirmed.