RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0191p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

GAYLON HAYDEN,

*Plaintiff-Appellant,*

*v.*

MARTIN MARIETTA MATERIALS, INC. FLEXIBLE BENEFITS PROGRAM,

*Defendant-Appellee.*

No. 13-6319

———————————

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 5:11-cv-00116—Thomas B. Russell, District Judge.

Decided and Filed:  August 18, 2014

Before:  GILMAN, GIBBONS, and STRANCH, Circuit Judges.

———————————

**COUNSEL**

**ON BRIEF:**  Geordi Garatt, Paducah, Kentucky, for Appellant.  Robert L. Steinmetz, Rebecca A. Wood, GWIN STEINMETZ & BAIRD, PLLC, Louisville, Kentucky, for Appellee.

GIBBONS, J., delivered the opinion of the court, in which GILMAN, J., joined, and STRANCH, J., joined in part.  STRANCH, J. (pp. 15–17), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.  Gaylon Hayden, a participant in Martin Marietta Materials, Inc.'s long-term disability plan ("the Plan"), appeals from two adverse judgments in her suit for long-term disability benefits under the Employee Retirement Income

1

Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* In the district court's first order, it affirmed the plan administrator's denial of benefits on Hayden's physical-disability claim but remanded her mental-disability claim because the plan administrator failed to consider medical evidence from three doctors. On remand, the plan administrator again rejected Hayden's claim, and the district court affirmed. For the reasons set forth below, we affirm with respect to Hayden's physical-disability claim but reverse with respect to her mental-disability claim. We further instruct the district court to award Hayden mental-health benefits consistent with the terms of the Plan.

## I.

Hayden was employed as an office manager at Martin Marietta beginning in 1997. She was covered by Martin Marietta's long-term disability plan, which was insured and administered by Liberty Life Assurance Company of Boston ("Liberty"). She stopped working as an office manager on January 4, 2010, and applied for benefits under the Plan the next day.

## A.

Martin Marietta employees who provide proof that they are disabled due to injury or sickness are entitled to monthly disability payments under the Plan. The Plan defines "disability" and "disabled":

1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:

    i. if the Covered Person is eligible for the 24 Month Own Occupation benefit, **"Disability"** or **"Disabled"** means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

    ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

In turn, the Plan defines "Any Occupation," "Own Occupation," and "Elimination Period":

**"Any Occupation"** means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.

**"Own Occupation"** means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.

**"Elimination Period"** means a period of consecutive days of Disability or Partial Disability for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.

Employees disabled by mental illness are entitled to recover "a combined period of 24 months of Monthly Benefit payments while the Covered person is insured."

**"Mental Illness"** means a psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) regardless of the underlying cause of the Mental Illness. If the DSM is discontinued, Liberty will use the replacement chosen or published by the American Psychiatric Association.

An employee is thus entitled to benefits for a period of 24 months if she cannot perform the duties of her own occupation from the first day of claimed disability through the next 180 days (the Elimination Period) and subsequent 24 months, and, thereafter is entitled to benefits if the employee cannot perform the material and substantial duties of any occupation. Hayden claims that she was disabled within the meaning of the Plan by virtue of both physical and mental ailments.

**B.**

Hayden suffers from a litany of physical ailments, including, among others: chronic hepatitis C; pancreatitis; fibrocystic breast disease with breast implants; degenerative arthritis; breast carcinoma; hypothyroidism; hypotension; hypertension; and crepitation[1] and decreased range of motion around her shoulders, cervical spine, hips, and knees.

Dr. Joseph Bassi is Hayden's primary treating physician. As early as 2003, Dr. Bassi suggested that Hayden consider applying for disability benefits. In his notes from April of that year, he wrote: "I spoke with the patient regarding her overall situation. She is slowly declining, has lost weight . . . . I think it is time Gaylon consider total permanent disability." On January 6,

---

[1]Crepitation in one's joints is characterized by grating or popping sounds and sensations that occur when the joint is moved.

2010, two days after Hayden left Martin Marietta, Dr. Bassi noted: "Her symptoms have been going on for an extended period of time[], months; mild to moderate severity, now more severe in the context of advancing generalized medical illness." Hayden continued to visit Dr. Bassi during the Elimination Period. By September 2010, Dr. Bassi had become concerned that Hayden suffered from syncope[2] or presyncope, and in November 2010, Hayden was hospitalized for presyncope. She was eventually sent to Vanderbilt University Medical Center, where a Q-SWEAT showed abnormal results as to whether Hayden suffered from syncope.

In January 2011, Dr. Bassi gave a sworn statement in connection with Hayden's claim for Social Security disability benefits. Dr. Bassi explained that by the time of his consultation in January 2010, "the multiple symptoms from her comorbities[3] had gotten to a point where . . . she just couldn't continue any further." Dr. Bassi also explained that Hayden suffered from serious dysfunction of her autonomic nervous system and that while she was on a medication called Midodrine, the FDA had discontinued the drug and there was no replacement. Without the Midodrine, Dr. Bassi opined that Hayden would be prevented from performing even basic functions such as standing for moderate periods of time. Hayden was eventually awarded Social Security disability benefits.

Dr. Kest also saw Hayden from June 2008 through 2010. In December 2009, he noted that her left vocal cord showed signs of paralysis but believed that her right vocal cord was compensating for the problem. In September 2010, he found an edema of the laryngeal structures which affected her ability to speak.

### C.

Hayden submitted evidence from four doctors detailing her serious psychiatric conditions. She saw Dr. Ronald Kelley from December 2006 to February 2007. Dr. Kelley diagnosed her with general anxiety disorder, major depression, and insomnia. Thereafter, Hayden's oncologist referred her to Dr. Roger Lyons for treatment of extreme anxiety with consequential depression. She saw Dr. Lyons throughout 2008. Dr. Lyons observed that her

---

[2]Syncope, generally speaking, is fainting.

[3]Comorbidity refers to the simultaneous presence of multiple, independent conditions.

"thought content was dysphoric and fear-based (appears to be a manic defense)," that her psychomotor skills "appeared leaden suggesting malaise," that she had "annoying preoccupations with fears that produce ritualistic/prophylactic behaviors," and that her emotional tone was dulled and numb. Hayden did not continue treatment with Dr. Lyons because her insurance company erroneously advised her that she would not be covered.

In his January 6, 2010, consultation with Hayden, Dr. Bassi noted that Hayden suffered from anxiety with depression that had become worse with her deteriorating health. He stated that she suffered from "disability, weakness, and inability to care about her day to day life" and that she had significant weight loss because she was "just not eating." Dr. Bassi explained that she had previously "forced herself to work, but now she just can't continue on." In February, he observed in connection with his diagnosis of anxiety and depression that "[h]er life is overwhelmed by symptoms at this time" and that "[i]t is obvious this patient is no longer able to function effectively with ongoing symptoms." Dr. Bassi's notes from July 2010 recount that she was "totally disabled, if nothing else, from her nerves, dealing with multiple issues at this time." In his sworn statement in connection with Hayden's claim for Social Security disability benefits, Dr. Bassi explained that by January 6, 2010, "she was basically overwhelmed with her day-to-day life chores, activity of daily living, stresses and just plain physical work she was doing" and that she was at "a point where she just couldn't function from her psychiatric issues."

Dr. Thomas Muehleman examined Hayden on March 25, 2010 in connection with her claim for Social Security disability benefits. Dr. Muehleman concluded that she was moderately impaired in her "ability to understand, retain, or follow instructions; probably markedly impaired in ability to sustain attention to perform simple, repetitive tasks, or relate to others and [co]-worker[s] and supervisors at this time; and markedly impaired in ability to tolerate stress and pressures associated with day-to-day work activities." Hayden was treated by Dr. David Meyer in September and November 2010. Although after the Elimination Period, Dr. Meyer also diagnosed her with recurrent major depression and severe anxiety. Dr. Meyer, like Dr. Bassi, concluded that, given Hayden's mental state, she was barely able to perform the basic activities of daily living and could not do "much beyond her basic self-care."

**D.**

Hayden's Elimination Period ran from January 4 to July 4, 2010. On July 22, 2010, Liberty conducted an initial file review of the records that Hayden's treating physicians provided. Liberty's initial conclusion was that while Hayden had "multiple medical problems . . . [,] none of them seem[s] to be significantly impairing at this time." Liberty assigned the file to Dr. David Peterson for peer-to-peer contact with Dr. Bassi and overall clarification.[4] In his conversation with Dr. Peterson, Dr. Bassi stated that Hayden was totally disabled from anxiety and depression. Dr. Peterson concluded that "[t]he medical records do not support impairment from working at her usual occupation based on any medical diagnosis." Dr. Peterson, observing that her chronic anxiety disorder was not well controlled, stated that his report did not address her diagnosis of chronic anxiety disorder and recommended an evaluation by a board-certified psychiatrist.

Liberty referred Hayden's file to Dr. Raymond Chagnon, an internist, and Dr. Gil Lichtshein, a psychiatrist, for an independent panel review. Dr. Chagnon contacted Dr. Bassi, who explained that "[a]s to restrictions and limitations she has difficulty handling daily life, decrease in interpersonal relationships, difficulty engaging in everyday life activities. Her depression and anxiety is her impairment, which are contributed by her medical problems." Dr. Chagnon concluded "that she has multiple medical problems and the list is very long, but there are no medical problems that are causing her any impairments, restrictions and limitations at this time. There is no specific impairment except for some generalized fatigue and weakness." Dr. Lichtshein also spoke with Dr. Bassi, who again explained that he believed Hayden was disabled as a result of her anxiety and depression. "He stated that she cannot function in interpersonal relationship and group settings and stated that she cries and bawls in his office." Dr. Lichtshein concluded: "There was no objective data, reported testing, behavioral description or collateral information to substantiate the presence of any level or degree of cognitive impairment, inability to perform activities of daily living, or any other type of functional impairment." Finally, he stated that "review of the enclosed records do not support any psychiatric diagnosis at this time."

---

[4]While Dr. Peterson's review was pending, the Plan received an April 27, 2010 assessment from the University of Kentucky's Chandler Medical Center explaining that Hayden was doing well and remained in clinical remission from her breast cancer.

Liberty denied Hayden's claim for benefits by letter dated August 26, 2010. Hayden appealed and submitted additional evidence, including Dr. Bassi's sworn statement in connection with her claim for Social Security disability benefits and records of her hospitalization in November 2010. Dr. Gregg Marella, an internist, reviewed Hayden's medical records. Dr. Marella concluded that the only restrictions on Hayden would be from November 2010 forward due to her syncopal episodes. As for Hayden's physical condition during the Elimination Period, Dr. Marella concluded that "[n]one of the medical conditions have been documented or fully explained in the office notes as to why they would totally limit or restrict the claimant from working."

Dr. Enrique Olivares, a psychiatrist, reviewed Hayden's mental-health records. Dr. Olivares agreed that her diagnoses for depression and anxiety disorders were supported, but concluded that "[t]here was no evidence of cognitive impairment, severe psychiatric symptoms, suicidal ideation, homicidal ideation, hallucinations or cognitive impairment that would have precluded [Hayden] from engaging in a full time job during the" Elimination Period.

Liberty upheld its denial of benefits in April 2011. The letter noted that Hayden had been awarded Social Security disability benefits. It explained that Liberty arrived at a different determination because the Social Security Administration and the Plan used different criteria to determine eligibility for benefits.

Hayden brought suit under ERISA. The district court upheld Liberty's denial of her physical-disability claim. The district court found Liberty's review of Hayden's mental-health records "faulty." Dr. Olivares was not provided with either Dr. Kelley's or Dr. Lyon's opinions during his review of Hayden's files. The district court also faulted Dr. Olivares for disregarding entirely Dr. Muehleman's report. The district court did not believe that the record established Hayden's entitlement to benefits and remanded the case to Liberty to conduct a full and fair review. On remand, Dr. Olivares reviewed the additional records and reconfirmed his initial conclusions. Liberty again denied Hayden's claim for benefits, this time relying only on Dr. Olivares's report. The case returned to district court, and the district court affirmed Liberty's denial of benefits.

## II.

We review *de novo* a district court order granting judgment in an ERISA disability action based on an administrative record. *See DeLisle v. Sun Life Assurance Co. of Can.*, 558 F.3d 440, 444 (6th Cir. 2009). Where the plan administrator is vested with discretion to determine eligibility for benefits, the plan administrator's denial of benefits will be overturned only if it is arbitrary and capricious. *Id.* Although the arbitrary and capricious standard of review is highly deferential, federal courts are not mere "rubber stamps." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). This entails review of the quality and quantity of the evidence, mindful that the plan administrator's decision should be upheld if it is the result of a deliberate, principled reasoning process and supported by substantial evidence. *DeLisle*, 558 F.3d at 444.

## A.

As a preliminary matter, we address Hayden's argument that Liberty and the district court erred in not considering evidence developed after the Elimination Period. We have explained that such evidence is relevant, but only to the extent that it sheds light on a claimant's condition during the Elimination Period. *See Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 690 n.1 (6th Cir. 2014). "The primary benefit of such evidence" is that it "speaks to the credibility and accurateness of the earlier evaluations and opinions." *Id.* Nevertheless, under the terms of the Plan, Hayden can prevail only by establishing that she was unable to perform her own occupation during the Elimination Period.

## B.

Hayden asserts that Liberty and in turn the district court ignored various pieces of record evidence in evaluating her physical-disability claim. But while she purports to identify numerous instances where Liberty and the district court ignored evidence, she does not explain why this evidence shows that she was disabled throughout the entirety of the Elimination Period. Consequently, Hayden cannot demonstrate that Liberty's "ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362

(6th Cir. 2002). Indeed, Liberty's conclusion to the contrary was the result of a principled reasoning process and supported by substantial evidence. *See Delisle*, 558 F.3d at 444.

We address Hayden's five arguments in turn. First, she asserts that Liberty and the district court ignored evidence that Dr. Bassi had diagnosed her with severe degenerative arthritis of her hands in 2005. Although Hayden was diagnosed with a degenerative disease, she was still required to demonstrate that on January 4, 2010, the arthritis prevented her from performing the duties of her occupation. Dr. Bassi's examination notes from January 6, 2010, do not mention arthritis in Hayden's hands, although he does mention arthritis in her shoulders, hips, and knees. Dr. Bassi's October 2010 examination notes again make no mention of arthritis in her hands and indicate that her arthritis in her shoulders, hips, knees, and cervical spine was controlled with the current regimen. Furthermore, Dr. Bassi never asserted to the reviewing physicians that Hayden could not perform the functions of her job because of arthritis in her hands or elsewhere. While Dr. Bassi did testify that Hayden's degenerative arthritis, peripheral neuropathy, and carpal tunnel would prevent her from using one or both hands in a work setting, this testimony relates only to November 2010, eleven months after Hayden was required to demonstrate that she was physically disabled. Liberty was not arbitrary or capricious in concluding that there was a lack of medical documentation that arthritis, peripheral neuropathy, or carpal tunnel prevented Hayden from performing the functions of her job from January 4, 2010, through July 4, 2010.

Second, Hayden asserts that Liberty ignored evidence of a 2-D echocardiogram showing diastolic dysfunction and hypertensive heart disease in 2008. But Dr. Marella acknowledged the echocardiograms in his report, and a handwritten notation on one of the echocardiogram reports stated "minor clinical finding." Liberty was not arbitrary or capricious in denying her claim for benefits on this basis.

Hayden's third, fourth, and fifth claims of error all relate to her diagnosis of syncope and presyncope. Although the evidence establishes that Hayden was likely disabled from syncope and presyncope by the end of 2010, there is no evidence demonstrating that these conditions were disabling before July 4, 2010. The first mention of syncope in the record occurs on September 9, 2010, where Dr. Bassi noted: "She has not told me this before, but she has had 2-3 syncopal episodes this past year. She had one this past week." There is no mention of syncope

before that and no suggestion that syncope or presyncope prevented her from being able to perform the functions of her job in January 2010. Liberty was not arbitrary or capricious in concluding that Hayden was not disabled as a result of syncope or presyncope throughout the Elimination Period.

Nor does the remainder of the medical evidence disclose that Liberty was arbitrary or capricious in concluding that Hayden was not physically disabled throughout the Elimination Period. For example, with respect to Hayden's left vocal cord paralysis, Dr. Kest's office contacted Liberty and relayed that Dr. Kest never placed Hayden out of work and never placed any restrictions on her. Moreover, Dr. Kest's notes indicated only that Hayden was to avoid harsh vocal use, yelling, or throat clearing; there is nothing to suggest she could not perform the ordinary communication required of her as an office manager. With respect to her breast cancer, the University of Kentucky Medical Center's assessment was that she was doing well and remained in clinical remission. With respect to hypothyroidism and gastritis, Dr. Bassi's notes indicate that these conditions were controlled during the Elimination Period. Her hepatitis C was chronic and there is no suggestion that it was disabling. And while Dr. Bassi noted that Hayden suffered from neuropathy, Liberty's review disclosed that "no workup has been done for it and no documentation that it is causing her any impairments, restrictions or limitations on medical record."

Finally, we disagree with the dissent that, in this particular case, Liberty should have taken a cumulative approach to Hayden's mental and physical health. What distinguishes this case from *Javery*, 741 F.3d at 701, and *Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 510 (6th Cir. 2005), is the fact that the Plan at issue here clearly contemplates that mental and physical disabilities will be considered separately. The Plan caps mental-disability payments at 24 months, while physical-disability payments are uncapped. To combine mental and physical disability in this case would contravene this express plan requirement, which we are required to follow. Accordingly, Liberty was not arbitrary or capricious in denying Hayden's physical-disability claim.

## C.

Hayden's primary challenge to Liberty's denial of her mental-disability claim is addressed to Liberty's reliance on Dr. Olivares's reports. It is true, as a general matter, that when a plan administrator relies on the opinion of one doctor over that of another, "the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald*, 347 F.3d at 169. But ERISA does not grant to a plan administrator carte blanche to adopt the opinions of its reviewing physicians. When a reviewing physician's report is "inadequate," a plan administrator cannot be said to engage in a deliberate, principled reasoning process when it adopts the position of that report. *Kalish*, 419 F.3d 501, 509–11. In particular, where a reviewing physician's opinion applies standards that conflict with the terms of the plan, that opinion is not evidence supporting a conclusion that the claimant is not disabled within the meaning of the plan. *See id.*; *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 619–20 (6th Cir. 2006).[5]

Here, disability under the terms of the Plan means that the claimant is unable to perform the material and substantial duties of her own occupation during the Elimination Period and for a period of 24 months and any occupation thereafter. The term "own occupation" is in turn defined to mean the claimant's occupation as it is normally performed in the national economy. Dr. Olivares's opinion is inconsistent with this definition in two respects.

First, Dr. Olivares's reports appear to apply a significantly heightened standard for a disabling mental illness that contravenes the definition provided in the Plan. Dr. Olivares's first report concluded that there was no evidence of "severe psychiatric symptoms, suicidal ideation, homicidal ideation, hallucinations or cognitive impairment that would have precluded the claimant from engaging in a full-time job during the" Elimination Period. As an initial matter, whether Hayden could have engaged in *some* full time job was irrelevant; the Plan required Dr. Olivares to consider whether she was disabled from performing the material and substantial

---

[5]We do not hold that reviewing physicians must conduct their reviews using the terms of the plan. We hold only that a reviewing physician's opinion is not substantial evidence that a claimant is disabled under the terms of the plan if the opinion applies standards inconsistent with the plan.

duties of *her own* occupation as an office manager. More importantly, Dr. Olivares's conclusion suggests that Hayden would have had to be suffering from "severe psychiatric symptoms, suicidal ideation, homicidal ideation, hallucinations" to be considered disabled. Although the term "cognitive impairment" used by Dr. Olivares is ambiguous and could suggest any mental disorder, including depression and anxiety, Dr. Olivares explained how he used the phrase. On the previous page, Dr. Olivares wrote that he did not believe that Hayden "had any evidence of cognitive impairment or depression of such magnitude that she needed to stay off work *because of severe suicidal ideation, homicidal ideation, hallucinations, or reality impairment*."[6] Dr. Olivares's definition—which would effectively preclude any claimant from establishing depression or anxiety as a disability—is inconsistent with the terms of the Plan, which focus on whether a claimant can perform the material and substantial duties of her own occupation.

Dr. Olivares's reports were inadequate in another respect. In both Dr. Olivares's initial and second report, he discounted Hayden's mental disorders because "[t]he company was going into bankruptcy" and because "she was asked to work long hours with very few breaks." Dr. Olivares reasoned, for example: "It is not clear whether this depression and anxiety are related to the medical problems that the claimant is experiencing or that there are issues related to her previous job" and "[t]here are issues related to her previous job [the bankruptcy] that could have an impact on her presentation and her inability to go back to that previous job." This reasoning was pervasive, leaving the firm impression that Martin Marietta's bankruptcy significantly influenced Dr. Olivares's view of Hayden's claim.

A straightforward reading of this language suggests one of two things, either of which is problematic. It could suggest that Dr. Olivares was assessing Hayden's disability in reference to her job at Martin Marietta. The Plan, however, defines disability in reference to how her job as office manager was performed in the national economy. Alternatively, his report could suggest that he thought that Hayden's anxiety and depression were caused by job stressors and that,

---

[6]Dr. Olivares's second report reaffirmed the conclusions in his initial report and used the same terminology: "There is no evidence of cognitive impairment, suicidal or homicidal ideation, hopelessness, helplessness, thought disorganization, delusional belie[fs], psychotic conditions or any other severe psychiatric symptoms described in the record prior to 01/05/14 that would have necessitated the claimant to be placed off work." The definition put forth by Dr. Olivares, requiring evidence of "severe psychiatric symptoms," is contrary to the actual terms of the Plan.

although she was incapable of performing her job at Martin Marietta, the anxiety and depression would abate if she performed her job as an office manager elsewhere. But nowhere in the record is there support for the position that Hayden's disability was caused by her job. Dr. Bassi's chart notes unequivocally conclude that her anxiety and depression were exacerbated by her rapidly deteriorating health and her husband's medical condition. Hayden reported to Dr. Muehleman that "what keeps her from working now is she is overwhelmed with sickness and has many diseases." Indeed, Hayden never mentioned work stress as a reason for her mental condition in her meetings with Dr. Meyer, as evidenced by the fact that it was Dr. Olivares who informed Dr. Meyer that Martin Marietta was going into bankruptcy. Having not personally examined Hayden, and finding no support for this conclusion in the record, Dr. Olivares's diagnosis from afar is not supported by substantial evidence. *See Evans v. UnumProvident Corp.*, 434 F.3d 866, 876, 880 (6th Cir. 2006). Dr. Olivares compounded his error when he relied on Martin Marietta's bankruptcy to discredit Dr. Meyer. Dr. Olivares addressed Dr. Meyer's conclusion as follows: "[Dr. Meyer] believes she is not ready to go back to work and he is not aware of the problems that she was having before she went on disability; namely that the company was restructuring and it was going into bankruptcy and her job was very strenuous as described by the claimant."

The plan administrator must "give reasons" for rejecting a treating physician's conclusions, *Elliott*, 473 F.3d at 620, and those reasons must be consistent with the terms of the plan and supported by the record, *McDonald*, 347 F.3d at 169–72. Because Liberty relied on Dr. Olivares's reports in denying Hayden's mental-disability claim and because Dr. Olivares's reports were inadequate in critical respects, we conclude that Liberty's denial of Hayden's claim was arbitrary and capricious.[7] *See Elliott*, 473 F.3d at 619; *Kalish* 419 F.3d at 509–11.

## D.

What remains is a question of remedy. Remand to the plan administrator is appropriate "where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled." *Cooper v. Life Ins. Co. of N.*

---

[7]Because we find Liberty's denial of benefits arbitrary and capricious on these grounds, we do not consider Hayden's alternative arguments.

*Am.*, 486 F.3d 157, 171 (6th Cir. 2007) (quoting *Elliott*, 473 F.3d at 622). But "[p]lan administrators should not be given two bites at the proverbial apple where the claimant is clearly entitled to disability benefits. They need to properly and fairly evaluate the claim the first time around; otherwise they take the risk of not getting a second chance, except in cases where the adequacy of claimant's proof is reasonably debatable." *Id*. at 172.

Although Dr. Olivares's errors were procedural in nature, we find no need to remand this matter for additional consideration by Liberty. Hayden has clearly established that she is mentally disabled under the terms of the Plan. She supported her claim with the opinions of Drs. Bassi, Muehleman, and Meyer, each of whom separately agreed that she suffered from anxiety and depression and was significantly impaired in her ability to perform the functions of her, or any, occupation. Drs. Bassi and Muehleman both found that Hayden was impaired in her ability to relate to and communicate with others. And Drs. Bassi and Meyer both found that Hayden was markedly impaired in her ability to handle the stress of day-to-day life. Finally, we note that "[c]ompeting evidence in the record showing that" her anxiety and depression symptoms "were not disabling is conspicuously absent." *Rochow v. Life Ins. Co. of N. Am.*, 482 F.3d 860, 866 (6th Cir. 2007).[8]

## III.

We affirm the district court's judgment with respect to Hayden's claim of physical disability. We remand Hayden's claim of mental disability for entry of an order requiring Liberty to award benefits consistent with the terms of the Plan and for such incidental relief as the district court finds appropriate in light of our decision.

---

[8]While Hayden had been diagnosed with anxiety and depression as early as 2007, "there is no 'logical incompatibility between working full time and being disabled from working full time.'" *Rochow*, 482 F.3d at 865 (quoting *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003)).

_____

**CONCURRING IN PART AND DISSENTING IN PART**

_____

JANE B. STRANCH, Circuit Judge, concurring in part and dissenting in part.  I fully concur in the majority's decision to reverse and remand for an award of disability benefits to Gaylon Hayden due to her mental disability.  The record leads me to conclude, however, that Hayden met the definition of disability under the Plan in January 2010 because she demonstrated she is disabled by "sickness" from performing her own or any occupation.  Because I would reverse and remand for a full award of disability benefits under the terms of the Plan, I respectfully dissent.

The majority recognizes, as I do, that Hayden suffers from a number of serious medical conditions.  The Plan provides disability benefits to a covered person who is disabled due to "sickness" from performing the material and substantial duties of her own occupation for a defined period and from performing the duties of any occupation thereafter.  The Plan defines "sickness" as "illness, disease, pregnancy or complications of pregnancy."  The terms "sickness," "illness," and "disease" can describe one single medical condition or multiple medical conditions.  Because Hayden suffers from chronic illness that is comprised of multiple physical and mental ailments, Liberty Mutual and this court are required by our precedents to evaluate the integrated or cumulative nature and severity of Hayden's entire illness.

In *Javery v. Lucent Technologies, Inc. Long Term Disability Plan for Management or LBA Employees*, 741 F.3d 686, 690–97 (6th Cir. 2014), the claimant suffered from several different physical and mental conditions.  The Plan provided benefits if the claimant was "'prevented by reason of . . . disability . . . from engaging in [his] occupation or employment at the Company.'"  *Id.* at 701.  The dispositive inquiry, the court explained, was whether the plaintiff was unable to work "due to his physical condition, his mental condition, or a combination of the two."  *Id.* (footnote omitted).  The court reversed and remanded for an award of disability benefits because the medical evidence submitted by the treating physicians and therapists established that the claimant was unable to work "due to a combination of his physical and mental conditions."  *Id.* at 702.

In *Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Boston,* 419 F.3d 501, 510 (6th Cir. 2005), this court reversed for an award of disability benefits where the district court and the parties "treated the diagnosis of depression as distinct from the diagnosis of the heart condition." The Plan provided for benefits if Kalish was "'unable to perform all of the material and substantial duties of his occupation on an Active Employment Basis because of an Injury or Sickness." *Id.* at 503, 509. The court pointed to a physician's conclusion that "Kalish was unable to return to work after considering Kalish's overall physical and mental health, which included an analysis of the interrelated effects of the heart condition and the depression." *Id.* The court rejected Liberty Mutual's reliance on a physician's report that did not "discuss Kalish's depression or acknowledge the connection between the two ailments." *Id.*

The majority opinion acknowledges the interrelatedness of Hayden's physical and mental conditions when it states that "Dr. Bassi's chart notes unequivocally conclude that her anxiety and depression were exacerbated by her rapidly deteriorating health," and "Hayden reported to Dr. Muehleman that 'what keeps her from working now is she is overwhelmed with sickness and has many diseases.'" Maj. Op. at 14. Yet, just as Liberty Mutual did, the majority breaks Hayden's sickness into separate physical ailments in order to determine whether, during the elimination period, the medical evidence supported a finding of disability as to each separate physical condition. Then the majority makes an additional division by separately evaluating her mental condition without regard to her co-existing physical problems. This approach precludes a comprehensive consideration of Hayden's co-morbid conditions as described by her treating physicians and fails to evaluate the whole of her illness to determine if she is entitled to disability benefits based on her physical condition, her mental condition, or a combination of the two. *See Javery,* 741 F.3d at 701. Like Javery, Hayden proved that she was entitled to disability benefits based on a combination of her physical conditions and her mental condition. *See id.* I do not dispute that the Plan clearly limits benefits for a mental disability to a period of 24 months. But that very common Plan provision does not prevent us or Liberty from considering whether Hayden suffers from a qualifying "sickness"—whether physical or a combination of physical and mental—that would entitle her to benefits starting on the first day of claimed disability and extending through and beyond the 24-month period allowed for mental disability benefits only.

Hayden's true inability to engage in sustained work activity comes clearly into focus if we treat her all of her physical and mental impairments in combination as one "sickness" as that term is defined under the Plan.  Accordingly, I would reverse and remand for an award of disability benefits that is consistent with the terms of the Plan and that is not limited by the 24-month cap for mental disability benefits.